OPINION
Clifford Brockman III ("Clifford") appeals from a judgment of the Montgomery County Probate Court, which found that Clifford's consent to the adoption of his son, A.M.B., was not necessary, because he was a parent who had failed to communicate with the child without justifiable cause within one year immediately preceding the filing of the adoption petition. For the following reasons, we will affirm the trial court's *Page 2 
judgment.
On July 17, 2006, Brian Bucher filed a petition to adopt his stepson, A.M.B. In his petition, Brian alleged that Clifford's consent to the adoption was not required because Clifford had failed to communicate with A.M.B. during the preceding year. On November 13, 2006, the court held a hearing on Clifford's alleged failure to communicate. Based on the testimony and documentary evidence presented at the hearing, the trial court made the following findings of fact:
"Brian Bucher (Brian) filed a petition to adopt his stepson, [A.M.B.], on July 17, 2006. The minor child was born on June 4, 1999 and is now thirteen years old. He resides with his mother, Jennifer Bucher (Jennifer), his stepfather, Brian and their children, a three-year old and 10-month old twins.
"The natural father, Clifford Brockman (Cliff) established paternity through the Montgomery County Juvenile Court. While the natural parents never married, they lived together and mutually cared for [A.M.B.]. Upon terminating their relationship, Jennifer retained legal custody of the child and Cliff was granted parenting time in 1996 or 1997, which Cliff exercised regularly over the next few years. He was also ordered to pay support which he has paid with some degree of regularity.
"In August 2001, Jennifer married Brian. When the child was approximately nine years old, visitation was reduced to one weekend day pursuant to the mother's request, allegedly because of the child's schedule and prior commitments. The visitation lessened as the child began to express the desire not to have visitation with his father and everyone, including Cliff[,] accommodated that request. Cliff believed that the child was going through a phase and would grow out of not wanting to spend *Page 3 
time with his father. The child was too busy with soccer, track and basketball to maintain consistent visitation. Even when Cliff was granted visitation, the child would not talk and always wanted to return home earlier than was scheduled. Jennifer and Brian did not encourage the child to call his father and allowed the child to choose whether he wanted to visit with his father. In recent years, Cliff was not given schedules of the child's sporting events. He was excluded from the child's life.
"In August 2005, Jennifer and Brian wrote Cliff a letter asking if he would permit them to change the child's surname to Bucher so they could have a complete family. They indicated that the child had begun to write his last name as Bucher at school, unbeknownst to them. In October, Jennifer called Cliff and inquired if he would grant permission for the change and he indicated that he was still considering the request. This letter did not indicate that Brian was contemplating adoption. Upon receiving the letter, Cliff contacted an attorney and requested time with [A.M.B.]. This fact is in dispute[.] Brian, Jennifer and [A.M.B.] all testified that the last time the child saw his father was Christmas 2004. Cliff and his mother testified that following the advice of counsel, Cliff saw [A.M.B.] in September 2005. The Court finds that the September 2005 visit did not take place. There was a visit at some point, but not within the statutory period as Cliff did not follow his attorney's advice. Cliff's mother, the child's grandmother[,] has consistently attempted to maintain a relationship with the child through gifts, cards and letters. Unfortunately, Cliff has not.
"Cliff moved to Atlanta, Georgia without notification to Jennifer in the spring of 2006. He returned shortly thereafter. There is no doubt that Cliff did not realize that his actions could result in the adoption of his child by his stepfather. He was frustrated *Page 4 
and depressed as he witnessed his relationship with his child deteriorate."
Based on its findings of fact, the trial court concluded that Brian had proven, by clear and convincing evidence, that Clifford had failed to communicate with his son for the requisite one-year period. The court then shifted the burden to Clifford to demonstrate some facially justifiable cause for his failure to communicate. The court found that Clifford met this burden in that he was "frustrated and his efforts to visit his son were thwarted by the child's schedule and the child's choice not to see his father." The court continued:
"Clearly, these actions were condoned by the petitioner and the child's mother. Cliff chose to abide by the requests and do nothing to enforce his visitation rights not realizing the consequences. Cliff is now being penalized for acquiescing to the child's desire not to visit him and the scheduling conflicts brought about by the child's involvement in sports. The father was not given a schedule of the child's sporting events, nor did he ask for one."
Having concluded that Clifford met his burden, the trial court then shifted the burden back to Brian to prove that Clifford's failure to communicate was without justifiable cause. Although the court found that there was "no doubt some level of interference from the Bucher family with Cliff's right to visit," the court found that the Buchers' interference was not significant. The court thus concluded that Clifford's consent to the adoption was not necessary.
On appeal, Clifford claims that the trial court's finding that he did not have contact with A.M.B. during the year preceding the adoption petition was against the manifest weight of the evidence and that Brian did not satisfy his burden of *Page 5 
establishing, by clear and convincing evidence, that he did not have contact with A.M.B. during the requisite one-year period. Clifford further claims that any lack of communication with A.M.B. was due to interference by the Buchers.
"The right of a natural parent to the care and custody of her children is one of the most fundamental in law. This fundamental liberty interest of natural parents in the care, custody and management of their children is not easily extinguished. Santosky v. Kramer (1982), 455 U.S. 745,753-754. Adoption terminates those fundamental rights. R.C.3107.15(A)(1). Accordingly, adoptions are generally not permissible absent the written consent of both parents. R.C. 3107.06." In reAdoption of Stephens, Montgomery App. No. 18956, 2001-Ohio-7027.
Under R.C. 3107.07(A), a parent's consent to adoption is not required when that parent "has failed without justifiable cause to communicate with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner."
"`The party petitioning for adoption has the burden of proving, by clear and convincing evidence, that the parent failed to communicate with the child during the requisite one-year period and that there was no justifiable cause for the failure of communication.' In re Adoptionof Holcomb (1985), 18 Ohio St.3d 361, paragraph four of the syllabus. Once the petitioner has established, by clear and convincing evidence, that the natural parent has failed to communicate with the child for the one-year period, the burden of going forward with evidence shifts to the natural parent to show some facially justifiable cause for the failure.In re Adoption of Bovett (1987), *Page 6 33 Ohio St.3d 102, paragraph two of the syllabus. The burden of proof, however, remains at all times with the petitioner, who must establish the lack of justifiable cause by clear and convincing evidence. Id. `Significant interference by a custodial parent with communication between the non-custodial parent and the child, or significant discouragement of such communication, is required to establish justifiable cause for the non-custodial parent's failure to communicate with the child. The question of whether justifiable cause exists in a particular case is a factual determination for the probate court and will not be disturbed upon appeal unless such determination is unsupported by clear and convincing evidence. Holcomb, supra, at paragraph three of the syllabus." In re Adoption of S.B.D., Miami App. No. 2006-CA-25,2006-Ohio-5133, ¶ 30.
Upon review of the record, we cannot conclude that the trial court's finding that Clifford failed to communicate with his son during the year preceding the adoption petition was against the manifest weight of the evidence. The Buchers testified that A.M.B. had sporting activities on Saturdays and Sundays during September 2005, and they denied that Clifford visited with A.M.B. after December 2004. A.M.B. likewise testified that he had not seen his father since December 2004, and he denied that the alleged September 2005 visit happened. Although Clifford and his mother, Sue Brockman, testified that the September 2005 contact had occurred, Sue indicated in her February 10, 2006 letter to A.M.B. that Clifford had last seen A.M.B. when they met on bikes. Clifford testified that this meeting occurred during May of 2004 or 2005, i.e., more than a year prior to the filing of the petition. Based on the evidence, the trial court did not err in crediting the Buchers' and A.M.B.'s testimony that the last contact *Page 7 
between Clifford and A.M.B. occurred in December 2004 and in not crediting the testimony of Clifford and Sue that Clifford and A.M.B. met in September 2005.
Clifford further argues that he had contact with A.M.B. during the requisite period based on communications between his mother, Sue Brockman, and A.M.B. The parties acknowledged that Sue sent A.M.B. a check for $50 in December 2005, which was cashed on January 9, 2006. Sue also sent A.M.B. a letter in February 2006, which was a response to the Buchers' letter requesting Clifford's consent to a change in A.M.B.'s surname.
In our view, Sue's communications with A.M.B. cannot be construed as communications by Sue for Clifford. The $50 check was written by Sue on a check in her name, and it was signed by her. There is no testimony that Sue wrote this check as a gift from Clifford to A.M.B. Moreover, the February 2006 letter is signed "Love, Grandma Sue Brockman" and specifically states that Clifford is waiting for A.M.B. to contact him. Nothing in the letter suggests that it was written by both Sue and Clifford, and the letter clearly reads as though it is from Sue alone. Although Clifford testified that Sue told him about the letter "ahead of time and discussed what she was going to say and that sort of stuff," Clifford's "involvement" with the letter does not support the conclusion that the letter was, even in part, from him.
In sum, although there was communication between Sue and A.M.B. during the relevant time period and there was conflicting testimony as to whether Clifford met with A.M.B. in September 2005, the trial court acted reasonably in crediting the Buchers' and A.M.B.'s testimony and in concluding that the Buchers established, by clear and convincing evidence, that Clifford failed to communicate with A.M.B. during the year *Page 8 
preceding the filing of the adoption petition.
Finally, Clifford argues that the lack of communication between himself and A.M.B. was justifiable due to interference by the Buchers. He argues that the pattern of visitation began to change after Jennifer's marriage to Brian. He reiterates that he hesitated to enforce the visitation order because he did not want to take the Buchers to court and he believed that A.M.B. "was going through a phase that would pass after he had grown accustomed to his new family situation."
As recognized by the trial court, the Buchers did not encourage A.M.B. to maintain a strong relationship with his natural father. A.M.B. expressed that he did not want to see his father, and Jennifer would allow A.M.B. to decide whether he wanted to see Clifford. She would also permit him to attend birthday parties with friends at times when Clifford was entitled to visitation and, as a result, visitation times were rescheduled. A.M.B. was heavily involved with sports, limiting A.M.B.'s available time, and, in recent years, Clifford was not sent his sports schedule.
The record further reflects, however, that Clifford acquiesced in A.M.B.'s desire not to visit with him. In explaining why there had been no visitation between December 2004 and August 2005, Clifford testified:
"[O]ver the time before that within the last two years or so before that it slowly gotten worse and worse to where he would come, he would not talk to me on the phone. Jen would give me excuses. [A.M.B.] would try to get on and talk. And he would just break down. I am not sure why I couldn't get an answer out of him. As I continually tried it got worse and worse. So, I was getting frustrated. She didn't want to give me any answers to what was going on. I didn't really know what to do. But I *Page 9 
didn't want to pressure him, thinking I was trying to take him away from his mom and his new family. I knew he had a little sister. I knew he loved her. I knew he wanted to see her. I just didn't want to force myself to get in between them but I just didn't want to take them to court. I thought that was just to[o] over the edge, you know, and I thought he was gong through a phase really. I thought he would want to see me after they had gotten, you know, use to his new stepdad, I guess."
Clifford stated that he did not enforce the visitation order by returning to court or calling the police because he did not want to cause stress to A.M.B.
Although the record reflects that the Buchers interfered with visitation to some extent, as recognized by the trial court, we find no error in the trial court's conclusion that the interference was not substantial. Visitation times were rescheduled when conflicts existed, and, although they did not encourage contact, the Buchers did not significantly discourage or try to prevent Clifford from seeing A.M.B. Moreover, the record reflects that much of the decrease in contact was due to Clifford's understandable dismay at A.M.B.'s apparent lack of interest in seeing him and Clifford's desire not to cause additional stress on A.M.B. As stated by the trial court, "There is no doubt that Cliff did not realize that his actions could result in the adoption of his child by his stepfather. He was frustrated and depressed as he witnessed his relationship with his child deteriorate." While the trial court apparently sympathized with Clifford's situation, it did not err in finding that the Buchers did not significantly interfere with Clifford's communication with A.M.B.
Clifford's assignments of error are overruled.
 The judgment of the trial court will be affirmed. *Page 10 
 FAIN, J. and DONOVAN, J., concur. *Page 1